UNITED STATES of America, Plaintiff,

v.

Kenneth Edward BULLOCK, Defendant.

Crim. No. 2:94cr160.

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 31, 1995.

Asst. U.S. Atty. Laura M. Everhart, Norfolk, VA, for plaintiff.

Sa'ad El–Amin, Richmond, VA, for defendant.

## MEMORANDUM OPINION AND ORDER

JACKSON, District Judge.

### INTRODUCTION

The matter before the Court is a Motion to Suppress evidence obtained after the defendant, Kenneth Bullock, was stopped by Maryland State Police. Bullock claims that the stop and the events which followed it violated his Fourth Amendment rights. For the reasons stated below the Court denies the defendant's Motion to Suppress the cocaine and grants the defendant's Motion to Suppress the seizure of the $2000.00 cash and any statements the defendant made while in custody.

### I. FACTS

Both the defendant and the government present vastly different accounts of the facts. The only details upon which they agree are those which follow in this paragraph. On the morning of July 13, 1994, Bullock was driving a brown, 1987 Nissan Maxima with Virginia tags southbound on Route 13 in Salisbury, Maryland. Bullock's girlfriend, Rehema Watson, was sitting in the front passenger seat. At approximately 10:18 a.m., two state troopers in an unmarked Maryland State Police cruiser flashed their lights signalling Bullock to pull over.

Bullock claims that he was driving within the 55 mile per hour speed limit when the troopers pulled him over. As Corporal M.A. Lewis came up to the driver's side of the car,

Bullock rolled down the window and asked the trooper why he was stopped. According to Bullock, Lewis replied, "I see you have a radar detector." Bullock responded that he thought using a radar detector was legal in Maryland, which Lewis confirmed.

Subsequently, Trooper R.A. Gunter exited the police cruiser and observed the Maxima from behind. Trooper Lewis then asked Bullock for his driver's license, which Bullock said he did not have. He was able, however, to furnish the car's registration. Lewis then asked Bullock to get out of the car and patted him down. Not finding any weapons, Lewis took Bullock to the rear of the car and advised him that he was travelling 61 miles per hour in a 55 mile per hour zone. Bullock claims that he denied the allegation.

Trooper Lewis returned to the front of the car leaving Bullock with Trooper Gunter. Bullock claims that Lewis reached into the car, opened a closed console in the front of the vehicle, and took out a roll of money. The money in the console was visible through the driver side window. Bullock claims that Lewis also spoke with Watson, telling her that he knew there were drugs in the car and that things would go easier for her if she admitted it. Watson replied that she did not know what he was talking about.

Lewis went back to Bullock and asked him how much money was in the roll of cash, to which Bullock replied approximately $2,000.00. While Trooper Gunter remained outside, Lewis directed Bullock to get in the police vehicle, got in himself, and advised Bullock that he was going to give him a ticket for speeding. He then asked Bullock whether he had any drugs or weapons in the car, to which Bullock responded that he did not. Lewis said that if that was the case, Bullock should have no objection to a search of the car. According to defendant's own motion, "Bullock stated that he had no objection." (Def.'s Mot. to Suppress at 4, ¶ 17.) Lewis immediately filled out a consent to search form, and gave it to Bullock.[1] Meanwhile, Trooper K.J. Plunkert arrived on the

---

1. Bullock notes that Trooper Lewis initially filled in the name Quincy Jones on the form, which was the name on the car's registration, and referred to him as Mr. Jones. However, Bullock subsequently told Lewis that his name was Keith Bullock. (Def.'s Mot. to Suppress at ¶¶ 19–20.)

scene. After Bullock signed the form, Troopers Lewis and Gunter removed Watson from the car and began a search, while Bullock and Watson stood at the rear of the Maxima. Shortly after the troopers began searching the rear of the vehicle, Lewis told Plunkert to handcuff Bullock and place him on the ground. Bullock claims that when Plunkert asked what the situation was, Lewis later replied, "We have to get something on him, because we already have him in custody." Some time later, Trooper Plunkert allowed Bullock to stand, but placed him on the ground again when Lewis indicated that he had found a fully loaded 9 millimeter clip in the back seat of the car, and a secret compartment below the seat.

Lewis asked Bullock how to open the compartment but Bullock responded that he did not know what he was talking about. Watson was handcuffed, and after several failed attempts to open the compartment, the troopers took Bullock, Watson, and the Maxima back to a state police barracks. When they arrived, Lewis told Bullock that if he did not tell him how to get into the secret compartment, he would open it with a crowbar. Bullock again responded that he didn't know anything about the compartment. Eventually Lewis was able to open the chamber by using an electric saw, and discovered several bags of cocaine inside.[2]

Meanwhile, Bullock and Watson had been placed in holding cells at the barracks. Bullock claims he was not advised of any rights before he was placed in the cell. Later, several troopers and a Drug Enforcement Administration Officer removed Bullock from his cell and advised him of his rights. Bullock initialed, but refused to sign a form signifying that he understood and would waive his *Miranda* rights. Bullock was later returned to his cell. Lewis interviewed Bullock later that evening, but he was not told that he was being questioned in connection

with the drugs found in the compartment. At approximately 10:15 that night Bullock and Watson were taken before a magistrate and arraigned.

The government's version of the incident is different. According to Trooper Lewis' testimony at the hearing on the defendant's motion, on the morning of July 13, 1994, he and Trooper Gunter were parked at the side of Route 13 with the front of their cruiser facing the edge of the highway. The area where they were parked was a 45 mile per hour zone. Lewis stated that he noticed that Bullock was driving above the speed limit and also that the car's windshield was cracked on the driver's side. Gunter's testimony supported Lewis' account.

The troopers pulled on to the highway and clocked Bullock's speed at 61.1 miles per hour.[3] When they pulled Bullock over, Lewis claims that the defendant stated that he was only driving 60 miles per hour. Furthermore, Lewis says that when he looked into the car he saw a large bundle of cash, two cellular phones, and a beeper. After Bullock told Lewis that he did not have his license, Lewis asked him to get out of the car.

The troopers then questioned Bullock and Watson separately. Bullock told the officers that his name was Keith J. Bullock and that he was coming from Delaware after picking up his girlfriend from college.[4] Lewis testified that both seemed unusually nervous and that neither the defendant or Ms. Watson was able to state the name of the college. Lewis asked Bullock whether there were any drugs or weapons in the car. Bullock told the officer no and that he could check the car if he wanted. Lewis then asked Bullock about the roll of money he had noticed earlier, removing it from the console and showing it to Bullock. Bullock claimed the money was to be used for a shopping trip in Norfolk.

2. Bullock's motion states that only one kilogram of cocaine was found in the compartment. As it turns out, Trooper Lewis discovered nine kilograms of cocaine.

3. By the time the troopers were able to ascertain Bullock's speed, the Maxima was travelling in a 55 mile per hour zone.

4. Evidence contained in the record shows that Keith J. Bullock is the name of the defendant's brother.

According to Lewis, Bullock told him again that he could search the car.

Meanwhile, the troopers called in to the dispatcher to check the defendant's identity and whether he was wanted for any violations but were not able to obtain any information. Lewis subsequently provided Bullock with a consent to search form which he signed "Keith Bullock." The form advised Bullock of his right to refuse to consent to the search. Lewis then found the gun clip, which he testified contained illegal "Black Talon" ammunition,[5] and the secret compartment. Trooper Plunkert handcuffed the defendant and advised him that a secret compartment had been found in the car. Since Lewis and Gunter were unable to open the compartment at the time, the troopers took Bullock, Watson, and the car to a nearby state police barracks, where they were eventually successful in discovering the cocaine.

The government claims that later in the day Bullock was advised of his constitutional rights. Afterward, Bullock spoke with Lewis, told him that he had been advised of his rights and had waived them. Bullock reportedly made several admissions during the conversation.

## II. LEGAL STANDARD

■ The defendant's right to be free from unreasonable searches and seizures comes from the Fourth Amendment which states:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

Any evidence acquired by government action in violation of the Fourth Amendment must be excluded at trial. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691–92, 6

L.Ed.2d 1081 (1961); *see also United States v. Clutchette,* 24 F.3d 577, 579 (4th Cir.1994).

The defendant's privilege against compelled self-incrimination derives from the Fifth Amendment, the relevant part stating that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. While a person may waive his Fifth Amendment Rights, his waiver must be "made voluntarily, knowingly and intelligently." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Voluntariness means that the defendant's waiver is "the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). Knowing and intelligent means that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

## III. DISCUSSION

Bullock moves to suppress the evidence obtained on July 13, 1994, for the following reasons. First, he claims that the police stop was not supported by objective criteria required by the Fourth Amendment. Second, he claims that Trooper Lewis had to open a closed console to obtain the $2,000.00 roll of cash, that this search and seizure was without consent and therefore, it was illegal. Third, he claims that in deciding to stop the car, Lewis was relying on a profile based primarily on the race and age of Bullock and Watson. Fourth, he claims that his consent to the car search was not knowing and intelligent because the form which he signed did not advise him that he could withdraw his consent. Fifth, he claims his arrest was without probable cause. Sixth, he claims his consent was effectively withdrawn after he was placed under arrest. Seventh, he claims that the troopers should have obtained a search warrant before opening the compartment at the police barracks. Eighth, he claims the delay between his arrest and ar-

---

**5.** Trooper Lewis testified that this ammunition is illegal in Maryland because of the amount of physical damage it causes upon impact.

raignment was unduly excessive. Finally, he claims that any admissions he may have made to the police occurred before he was properly advised of his constitutional rights.

The elements of Bullock's Motion to Suppress can be summarized as challenging: (1) the legality of the stop by the troopers; (2) the legality of the resulting search of the car; (3) the legality of his arrest and the circumstances following that arrest, and; (4) whether he was properly informed of his constitutional rights before he talked with Trooper Lewis. The Court will address each one of these challenges in turn.

**A. Bullock's stop was legal because the troopers had articulable, reasonable suspicions based on objective facts that he was engaged in criminal activity.**

■ The Fourth Circuit has stated that "[a] law enforcement official may stop a moving vehicle without a warrant and for less than probable cause if, from all of the circumstances, he has an articulable, reasonable suspicion based upon objective facts, together with rationale inferences therefrom, that either the vehicle or any of its occupants is engaged in criminal activity." *United States v. Poole,* 718 F.2d 671, 674 (4th Cir.1983) (citing *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). An examination of the facts of *Delaware v. Prouse,* shows that safety violations meet the criminal activity requirement.

In *Prouse,* a patrolman stopped a car operated by the defendant and confiscated marihuana which he saw on the floor of the car. Consequently, the defendant was indicted for illegally possessing a controlled substance. The defendant made a motion to suppress the evidence of the marihuana, and at the hearing on the motion the patrolman testified "that prior to stopping the vehicle he had observed neither traffic or equipment violations nor any suspicious activity, and that he made the stop only in order to check the driver's license and registration." *Id.* at 650, 99 S.Ct. at 1394. The trial court granted the defendant's motion finding that the stop violated the Fourth Amendment. The Delaware Supreme Court affirmed. The state of

Delaware appealed claiming that discretionary spot checks such as the one made by the officer were reasonable under the Fourth Amendment because they promoted safety on the roads.

The United States Supreme Court granted certiorari, and affirmed the Delaware Supreme Court. The High Court found that the practice of discretionary spot checks by officers for public safety reasons was not "a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests ..." *Id.* at 659, 99 S.Ct. at 1399. In reaching its decision, the Court noted that: "[t]he foremost method of enforcing traffic and vehicle safety regulations ... is acting upon observed violations." *Id.* Therefore, the Court held:

> [E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, *or that either the vehicle or an occupant is otherwise subject to seizure for violation of law,* stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Id.* at 663, 99 S.Ct. at 1401 (emphasis added).

Based on the facts of the instant case the Court finds that Troopers Lewis and Gunter had an articulable and reasonable suspicion that Bullock's car was subject to seizure for a violation of the law. Both troopers testified that Bullock was speeding. Furthermore, Trooper Lewis testified that he noticed that Bullock's car had a crack in the windshield, which is a safety violation under Maryland law.

**B. Although the seizure of the $2,000.00 was not valid, the search of Bullock's car and seizure of the drug evidence was valid.**

Bullock makes two claims regarding the troopers' search of his car. First, Bullock alleges that Trooper Lewis reached into a closed console without his consent in order to retrieve the $2,000.00. Therefore, he claims that the seizure of the money was illegal.

Second, Bullock claims that his consent to the search of the car was not knowing and intelligent because the consent form did not advise him that he could withdraw his consent. Bullock also makes arguments, related to this claim, that his consent was effectively withdrawn following his arrest, and that since he would not assist Trooper Lewis in opening the secret compartment, it was incumbent upon Lewis to obtain a search warrant.

1. **The evidence of the $2,000.00 must be suppressed because its seizure did not meet all of the requirements of the "plain view" doctrine.**

■ At the hearing on the Motion to Suppress, Trooper Lewis testified that when he looked inside Bullock's car after stopping him, he observed the roll of cash, two cellular phones, and a beeper inside the car. As the Court understands the circumstances of the morning, Trooper Lewis did not have to open the car's console to see the cash or the other items. Therefore, the Court finds that the roll of cash was in plain view.

■ Under the principle known as the "plain view" doctrine, a police officer can make a warrantless seizure of private possessions where: (1) the officer is lawfully present at the place where he saw the evidence; (2) the officer has lawful access to the object, and; (3) it is immediately apparent to the officer that the observed item is subject to seizure. *See United States v. Legg*, 18 F.3d 240, 242 (4th Cir.1994) (citing *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990)); *see also Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540–41, 75 L.Ed.2d 502 (1983) (stating that it must be " 'immediately apparent' to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.") (citations omitted). As to the first requirement, the Court has already determined that Bullock's stop was legal. As to the second requirement, the Court accepts as true Trooper Lewis' testimony that he did not have to open the console in order to gain access to the money. The Court finds, however, that Trooper Lewis did not meet the third requirement of the plain view doctrine. Trooper Lewis testified

at trial that when he saw the money, he did not think it was evidence of any crime or that it was contraband. Therefore, evidence of the $2,000 cash must be suppressed.

2. **The search of Bullock's car and seizure of evidence therein was valid because the record shows that he consented to the search.**

■ Bullock argues that his consent to the search of his car was not knowing and intelligent because the form he signed did not advise him that he could withdraw his consent. However, there is no constitutional requirement that a person's waiver of Fourth Amendment rights be knowing and intelligent. As the Supreme Court stated in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), "the requirement of knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Id.* at 237, 93 S.Ct. at 2052–53 (noting that the standard has most often been applied to waiver of counsel). The Supreme Court went on to state:

There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures.

*Id.* at 241, 93 S.Ct. at 2055.

■ Furthermore, the Court finds no merit in Bullock's arguments that his consent was effectively withdrawn after his arrest, and that his refusal to assist the troopers in opening the compartment required them to obtain a search warrant. The hearing testimony and the record before the Court show that Bullock never explicitly told the troopers that he would not help them open the compartment. Instead, Bullock maintained that he did not know anything about the existence of a compartment in the car. That is not

equivalent to withdrawing the consent which he gave earlier.

Finally, it must be kept in mind that "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). The Court believes that "it was objectively reasonable for the police to conclude that the general consent to search [the defendant's] car included consent to search containers within that car which might bear drugs." *Id.* at 251, 111 S.Ct. at 1804. Bullock agreed to a search of his car both verbally and in writing, each time following Trooper Lewis' query as to whether there were any drugs in the car. His only response when asked about the compartment was that he knew nothing about it. Bullock cannot cry foul now just because he did not believe any drugs would be found.

### C. The Troopers had probable cause to arrest Bullock once they found the clip containing the illegal ammunition.

█ Bullock claims that Trooper Lewis did not have probable cause to arrest him because at the time of his arrest, the hidden compartment had not been found. Probable cause to arrest refers to the existence of "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *United States v. LeFevre,* 685 F.2d 897, 900 (4th Cir.1982).

Bullock was arrested when Trooper Lewis instructed Trooper Plunkert to handcuff him. At that point, he was deprived of his freedom of movement. However, the Court finds that this occurred after Lewis found the fully loaded 9 millimeter clip containing the illegal "Black Talon" ammunition. Moreover, Lewis testified at the hearing that when he finds a gun clip, he usually finds a gun nearby. Therefore, the Court finds that once Lewis found the clip with the illegal ammunition, he had probable cause to arrest Bullock.

### D. Bullock did not knowingly and intelligently waive his *Miranda* rights, therefore, any statements which he made during questioning are inadmissible at trial.

█ The defendant claims that he was not fully informed of his *Miranda* rights, because he was not told that cocaine was found in the compartment. As the Supreme Court has stated, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal ... the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). Upon consideration of the totality of the circumstances, the Court finds that Bullock did not knowingly and intelligently waive his *Miranda* rights.

The Court notes that Trooper Lewis never informed the defendant why he was placed under arrest. Furthermore, no one told Bullock that drugs had been found in the secret compartment. The Court believes that without knowing at least one of these factors, Bullock could not have waived his rights with a "full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Therefore, any statements which he made during questioning are inadmissible at trial.

Furthermore, the Court notes that it is not clear that the defendant waived his *Miranda* rights at all. At the hearing on the motion, Detective J. Thompson testified that he informed Bullock of his rights. He also testified that he presented the defendant with a form to sign to acknowledge that he understood his rights, that he was willing to answer questions without counsel, and that he was doing so voluntarily. Bullock never signed the form. In fact, a note on the form states that he refused to sign it. For this reason also, the Court cannot find that Bullock waived his Fifth Amendment rights fully and freely, and any statements which he made during questioning are inadmissible at trial.[6]

---

6. Bullock also argues that his statements are inadmissible because of the delay between his arrest and arraignment. Since the Court has determined that his post-arrest statements are

## CONCLUSION

For the reasons stated above, the defendant's Motion to Suppress the drug evidence is **DENIED** and his Motion to Suppress the $2,000.00 cash and any statements made while in custody is **GRANTED**.

The clerk is **DIRECTED** to send a copy of this order to the United States Attorney and counsel for the defendant.

It is so **ORDERED.**

inadmissible because he did not knowingly waive his *Miranda* rights, it will not address the allegation that the delay between his arrest and arraignment was excessive.